Jon M. Sands
Federal Public Defender
Dale Baich (Ohio Bar No. 0025070)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
850 West Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2816
Facsimile: 602-889-3960
dale_baich@fd.org
robin_konrad@fd.org

Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Daniel Wayne Cook,<br><br>    Plaintiff,<br><br>v.<br><br>Janice K. Brewer, Governor of Arizona; Charles L. Ryan, Director, Arizona Department of Corrections; Ernest Trujillo, Warden, Arizona Department of Corrections - Eyman; Carson McWilliams, Warden, Arizona Department of Corrections - Florence; Does 1-50<br><br>    Defendants. | Case No.<br><br>COMPLAINT FOR EQUITABLE, INJUNCTIVE, AND DECLARATORY RELIEF [42 U.S.C. § 1983]<br><br>Death Penalty Case |

## NATURE OF ACTION

1. This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations by the Arizona Department of Corrections ("ADOC") of Plaintiff's right to be free from cruel and unusual punishments under the Eighth Amendment to the United States Constitution.

2. This Complaint does not challenge Plaintiff's underlying capital conviction or sentence of death, nor does it allege that lethal injection as a form of execution is *per se* unconstitutional. Rather, Plaintiff challenges the manner and means by which ADOC intends to execute him.

3. Plaintiff has reason to believe that ADOC obtained a substance

purported to be sodium thiopental—the drug that is critical to insuring the constitutionality of his execution—from a foreign manufacturing source that is not regulated by the Food and Drug Administration ("FDA") in violation of federal law. Due to the fact that ADOC obtained the drug from a non-FDA-regulated foreign source and that there is evidence showing that the drug is substandard, the substance is not what it purports to be, is contaminated, or is otherwise substandard.

4.   Since November 10, 2010, when Plaintiff filed his initial complaint, he has discovered significant new evidence that demonstrates that the substance imported by the ADOC:

- Has officially reported issues with lack of efficacy in the United Kingdom (see infra at ¶¶ 49-50);
- Is made for use *not in humans, but in non-human animals* (see infra at ¶¶ 52-54);
- Has documented reports of problems in its use in three executions in the United States (see infra at ¶¶ 55-60);
- Was imported in a manner nearly identical to the process used in Georgia—a process that has resulted in the Drug Enforcement Administration seizing Georgia's supply of the substance (see infra at ¶ 61.)

5.   Plaintiff seeks equitable, injunctive, declaratory, and monetary relief to prevent Defendants from carrying out his execution by using non-FDA-regulated substance that ADOC obtained from a foreign source or any other source.

**JURISDICTION AND VENUE**

6.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and monetary relief), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

7.   Venue is proper pursuant to 28 U.S.C. § 1391(b). Plaintiff is currently incarcerated at the Arizona State Prison Complex ("ASPC")–Eyman, Browning Unit, 4374 East Butte Avenue, Florence, Arizona, located in this District.

8.   All executions conducted by ADOC occur at the Central Unit at ASPC–Florence. The events giving rise to this complaint have occurred and/or will

occur in this District.

## THE PARTIES

9. Plaintiff is a United States citizen and a resident of the State of Arizona. He currently is a death-sentenced prisoner under the supervision of ADOC. He is incarcerated at ASPC-Eyman, Browning Unit, in Florence, Arizona. The State of Arizona filed a motion for a warrant of execution on September 24, 2010. His execution date has been scheduled for April 5, 2011, at 10:00 A.M. His execution will take place at the Central Unit at ASPC-Florence.

10. Defendant Janice K. Brewer is the Governor of the State and is being sued in her official capacity for equitable relief.

11. Defendant Charles Ryan is the Director of ADOC and is being sued in his official capacity for equitable relief.

12. Defendant Ernest Trujillo is the Warden of ASPC-Eyman, where Plaintiff is incarcerated, and is being sued in his official capacity for equitable relief.

13. Defendant Carson McWilliams is the Warden of ASPC-Florence, where Plaintiff will be executed, and is being sued in his official capacity for equitable relief.

14. Plaintiff is ignorant of the true names of Does 1-50, but they have or will participate in his execution by virtue of their roles in ordering, supplying, distributing, transporting, storing, or mixing lethal injection drugs; or preparing, implementing or carrying out the lethal injection itself.

15. Medical Team Members One, Two, and Three are medical doctors licensed to practice medicine. The Medical Team Members are being sued in their official and personal capacities for monetary damages. If Plaintiff discovers the Medical Team Members' true identities, he will amend his complaint accordingly.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff does not believe that exhaustion is necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this suit does not

challenge prison conditions and because there are no available administrative remedies that could address the challenged constitutional violations.

17. It would be futile for Plaintiff to attempt to exhaust any remedies available to him in an effort to resolve this issue, as ADOC has recently refused to provide information to assist in resolving this issue.

18. In *Landrigan v. Brewer*, the district court set forth the procedural history regarding the State of Arizona's failure to provide information regarding its acquisition of sodium thiopental to be used in an upcoming execution. 2010 WL 4269559, at *9 (D. Ariz. Oct. 25, 2010).[1] Specifically, the State failed to comply with this Court's order to provide information to Landrigan about its acquisition of sodium thiopental.

19. Because the State continually refused to provide information regarding its acquisition of the sodium thiopental in *Landrigan*, Plaintiff has no reason to believe that the State's actions would be different in his case.

### RELEVANT FACTS

20. Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten.

21. On July 6, 1988, Plaintiff was convicted of two counts of first-degree murder. On August 8, 1988, he was sentenced to death. He sought and was denied relief from his convictions and sentences in state and federal court. *Cook v. Schriro*, 538 F.3d 1000 (9th Cir. 2008).

22. On February 8, 2011, the Arizona Supreme Court issued a warrant of execution for Plaintiff and set his execution date for April 5, 2011.

---

[1] The United States Supreme Court vacated this Court's order granting Landrigan a temporary stay of execution. *Brewer v. Landrigan*, 131 S. Ct. 445 (Mem.) (Oct. 26, 2010).

Page 4

1   23.  Because Plaintiff was sentenced before November 23, 1992, under Arizona law he has the option of choosing between lethal injection and lethal gas. If Plaintiff refuses to choose his method of execution, ADOC must use lethal injection to execute him.  Ariz. Rev. Stat. § 13-757(B).

### *The Critical Role of Sodium Thiopental in Plaintiff's Execution*

24.  ADOC's current written lethal injection protocol became effective on September 15, 2009.  *See* Preparation and Administration of Chemicals, ADOC Department Order 710, Attachment F, *available at* http://www.azcorrections.gov/Policies/700/0710.pdf.  The chemical protocol provides that executions will occur via administration of a sequence of three drugs—sodium thiopental, pancuronium bromide, and potassium chloride.

25.  Sodium thiopental, the first drug in ADOC's protocol, is an ultra-fast-acting barbiturate.  "When successfully delivered into the circulation in sufficient quantities, sodium thiopental causes depression of the nervous system that would permit excruciatingly painful procedures to be performed without causing discomfort or distress." *Dickens v. Brewer*, No. CV07-1770-PHX-NVW, 2009 WL 1904294, at *11 (D. Ariz. July 1, 2009).

26.  The second drug, pancuronium bromide, is a paralytic.  If pancuronium bromide is given to a conscious person, the result is severe agony. *Dickens*, 2009 WL 1904294, at *11.

27.  The final drug, potassium chloride, causes cardiac arrest.  If given to a conscious person, potassium chloride causes "a severe burning sensation" and would result in severe pain.  *See Dickens*, 2009 WL 1904294, at *12.

28.  In a three-drug protocol, the purpose of the sodium thiopental is not to kill the prisoner but to "produce a deep and long-lasting anesthesia." *Dickens*, 2009 WL 1904294, at *11, *21.  The purpose of the pancuronium bromide is to paralyze the muscles.  The purpose of the potassium chloride is to kill the prisoner by stopping the heart.

29. If Plaintiff is not properly anesthetized by the sodium thiopental before being given the second and third drugs, he will suffocate and experience excruciating pain. *See Baze v. Rees*, 553 U.S. 35, 53 (2008) ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride.").

30. ADOC obtained a substance purported to be sodium thiopental from Dream Pharma Ltd. ("Dream Pharma") in Great Britain, and that drug will be used in Plaintiff's scheduled execution.

***The Constitutionally Unacceptable Risks Inherent in using Non-FDA-Regulated Substance Purported to be Sodium Thiopental***

Sodium thiopental is a schedule III controlled substance regulated under a complex set of federal laws that address the manufacturing, possession, distribution, labeling, and importation of controlled substances. *See, e.g.*, Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–399b.; Uniform Controlled Substances Act, 21 U.S.C. §§ 801–904.; Controlled Substances Import and Export Act, 21 U.S.C. §§ 951–971.

31. Because sodium thiopental is an ultra-short-acting barbiturate, it takes effect and wears off very quickly. Even when sodium thiopental is fully potent and properly administered, its anesthetic effects can wear off within just a few seconds. This is why it is intended to assist in the induction of anesthesia and is generally considered inappropriate for maintaining a surgical plane of unconsciousness.

32. The sodium thiopental to be used in his execution is not fully potent and it will have dire effects and cause Plaintiff excruciating pain from the administration of the second and third drugs. *See supra* ¶ 29.

33. Assuming the substance obtained from Great Britain is in fact sodium thiopental and is not counterfeit, it is still less potent than domestically produced

sodium thiopental. Sodium thiopental obtained from Great Britain would have been produced according to the definition of thiopental established by the British Pharmacopeia. The British Pharmacopeia defines sodium thiopental for injection to be a mixture containing *the equivalent of not less than 84.0 and not more than 87.0 percent of thiopental.* In contrast, the official United State Pharmacopeia defines sodium thiopental for injection to contain "*not less than 93.0 percent and not more than 107.0 percent*" of thiopental.  The discrepancy between the British and United States standards means that any thiopental produced in accordance with the former definition would necessarily be less potent than U.S. produced thiopental.

34.   ADOC's protocol delineating the chemicals and dosage to be used in an execution is based on drugs produced in the United States. Thus, using sub-potent sodium thiopental from Great Britain in the same dosage as domestically produced sodium thiopental will fail to properly anesthetize Plaintiff.

35.   In addition to pharmacological deficiencies, unapproved foreign drugs are presumptively *un*safe and *in*effective. "FDA's Office of Compliance has cautioned that [d]rugs from foreign countries do not have the same assurance of safety as drugs actually regulated by the FDA due to the risk that counterfeit or unapproved drugs will be sent to consumers and also because without regulation of repackaging, storage conditions, and many other factors, drugs delivered to the American public from foreign countries may be very different from FDA approved drugs with respect to formulation, potency, quality, and labeling." *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 789 (8th Cir. 2006) (internal citations omitted).

36.   FDA regulation ensures that a product is pure and free of potentially harmful contaminants produced in the production of the product and that the drug product actually contains the amount and concentration of the drug as indicated on the label.  Without FDA regulation, the product does not reliably present the important information contained in the product labeling: basic pharmacologic

information, indications, contraindications, adverse reactions, precautions warnings, and usual dosage.

37. A drug from a non-FDA-regulated foreign manufacturer was not produced in an environment requiring the drug to be effective. A non-FDA-regulated drug could be contaminated or compromised.

38. Accordingly, the non-FDA-regulated substance obtained by ADOC lacks the appropriate safeguards to ensure it is not contaminated, that it is actually sodium thiopental, and that it is viable.

39. There is a substantial, constitutionally unacceptable risk that the substance itself could cause pain and suffering to Plaintiff because it is contaminated, compromised, or substandard. There is also a substantial, constitutionally unacceptable risk that Plaintiff will suffocate and experience excruciating pain from the second and third drugs administered to him during his execution because he will not be properly anesthetized by the non-FDA-regulated substance.

***Information Regarding the Source of the Non-FDA-Regulated Substance***

ADOC obtained the foreign substance from a small wholesaler in London doing business under the name Dream Pharma. Dream Pharma's only physical presence is rented space at the rear of a West London driving school called the Elgone Driving Academy.

40. Dream Pharma purchased each batch of finished thiopental from another United Kingdom company called Link Pharmaceuticals, Ltd. ("Link"), which is a subsidiary of a third company called Archimedes Pharma UK, Ltd. ("Archimedes"). Link purchased unfinished thiopental from a German company called Sandoz International GmbH ("Sandoz"). Sandoz produced the thiopental at a facility located in Austria.

41. Dream Pharma did not conform with FDA's regulations or take the necessary steps to preserve the sodium thiopental.

42. Dream Pharma's website (www.dreampharma.com) states that the company sells "unlicensed" drugs, "discontinued" drugs, and products that have been "discounted" from the UK market.

43. Nor is Dream Pharma the only weak link in the chain that developed the imported thiopental in question. A recent FDA import alert confirms that FDA has never inspected the Sandoz facility that produced the sodium thiopental for compliance with FDA's regulations for human drugs. *See FDA Import Alert No. 66-66* (Dec. 21, 2010), available at http://bit.ly/htudDi (visited March 14, 2011). Further, FDA has in the past taken the position that the Sandoz facility in question fails to distinguish between animal drugs and those intended for human consumption. *See FDA Warning Letter to Sandoz GmbH*, available at http://bit.ly/egqvVe (visited March 14, 2011).

44. FDA has voiced concerns to Sandoz that its manufacturing plant "fail[s] to develop control systems for [its] operation as are necessary to prevent contamination of aseptic processing, which includes a system for monitoring environmental conditions" and "lack[s] appropriate written procedures, designed to prevent microbiological contamination of drug products purporting to be sterile." *See FDA Warning Letter to Sandoz GmbH*, available at http://bit.ly/egqvVe (visited March 14, 2011).

45. Sodium thiopental is an aseptic drug and it must be kept in very strict aseptic conditions. No moisture or dirt can enter any of the plugs or nozzles. It is very difficult to maintain a filing line in aseptic conditions and the entire line must be replaced when it needs cleaning, not just individual parts.

46. Despite problems within its manufacturing plant, Sandoz has continued to manufacture thiopental.

***Problems with the Substance Purchased by ADOC***

47. ADOC purchased six packs of 25 vials of a substance purported to be sodium thiopental from Dream Pharma on September 20, 2010. (Ex. A) The

substance is identified as Batch No. AW6022 Exp. 05/14. *Id*.

48. The Medicines and Healthcare Regulatory Agency ("MHRA"), the United Kingdom counterpart to the U.S. Food and Drug Administration, reported that there have been twelve adverse drug reaction reports concerning sodium thiopental in the past two years. (Correspondence from Department for Work and Pensions Legal Group, March 14, 2011, attached as Ex. B.) Five of those reports related to the efficacy of the substance, including one concerning batch AW6022. *Id*.

49. ADOC's batch of the substance is ineffective, adulterated, or otherwise substandard.

50. Further, documents provided to Plaintiff by the U.S. Customs and Border Protection under the Freedom of Information Act indicate that the drugs imported by ADOC, including both sodium thiopental and pancuronium bromide, are formulated *not* for humans, but for *non-human animals*. (U.S. Food and Drug Administration - Form 701 Inquiry, Dec. 8, 2010 (Bates No. US Customs FOIA 03.23.11_010), attached as Ex. C.)

51. Other entities importing sodium thiopental and pancuronium bromide from Dream Pharma have imported a formulation meant for human use. (*See* U.S. Food and Drug Administration - Form 701 Inquiry, Dec. 8, 2010. (Bates No. 03.21.11_003 - 006; -007), attached as Ex. D.)

52. ADOC's batch of the substance is not meant for human use. Administration of such drugs will fail to properly anesthetize Plaintiff or will themselves cause him severe pain. *See supra* ¶ 39.

***Problems Occurring in Previous Executions Using the Non-FDA-Regulated Substance***

On October 26, 2010, ADOC executed Jeffrey Landrigan using a foreign, non-FDA-regulated substance purported to be sodium thiopental. The drugs used in Landrigan's execution were obtained from Dream Pharma.

53. Landrigan's eyes remained open throughout the execution. (Affidavit by

Dale A. Baich at ¶¶ 4-11, filed in *Hammond v. Owens*, No. 2011CV195436. (Fulton County (Georgia) Superior Court, attached as Ex. E.)

54. On September 27, 2010, Georgia executed Brandon Rhode. Rhode's eyes remained open throughout the execution. (Affidavit of Randy Loney at ¶ 4 filed in *Hammond v. Owens* No. 2011CV195436 (Fulton County (Georgia) Superior Court, attached as Ex. F.)

55. On January 25, 2011, Georgia executed Emmanuel Hammond. Hammond's eyes remained open throughout the execution. *See* Owen Bowcott, *Executed man's mother urges ban on exports profiting from death penalty,* Guardian, Feb. 13, 2011, http://www.guardian.co.uk/world/2011/feb/13/executed-man-mother-export-ban (last visited Mar. 4, 2011).

56. The substances purported to be sodium thiopental that were used in the Landrigan, Rhode, and Hammond executions were all obtained from Dream Pharma. (Invoice Details, July 21, 2010, attached as Ex. G; *see also* Ex. A.)

57. Upon information and belief, no execution using domestically produced sodium thiopental has resulted in a prisoner's eyes remaining open during the execution. (*See, e.g.* Affidavit of Carroll Pickett at ¶5, filed in *Hammond v. Owens* No. 2011CV195436 (Fulton County (Georgia) Superior Court, attached as Ex. H; *see also* Ex. E at ¶¶ 15-17, Ex. F at ¶ 5.)

***ADOC Obtained the Substance in Violation of Federal Law***

58. On March 15, 2011, the Drug Enforcement Administration seized Georgia's supply of sodium thiopental, which Georgia had also obtained from Dream Pharma, based on questions regarding how the substance was imported into the United States. *Agency Seizes Georgia's Supply of Execution Drug*, N.Y. Times (Mar. 16, 2011) available at http://www.nytimes.com/2011/03/16/us/ 16lethal.html.

59. ADOC obtained the foreign substance in violation of federal law. *See, e.g.*, 21 U.S.C. §§ 301 *et seq.*; 21 U.S.C. §§ 801 *et seq.*; 21 U.S.C. §§ 951 *et seq.*

***ADOC's failure to follow the written execution protocol increases the substantial risk of serious harm to Plaintiff***

In addition to using a substandard or adulterated substance in Plaintiff's execution, ADOC cannot ensure the safeguards provided in the written execution protocol because ADOC has repeatedly refused or been unable to follow its written protocol.

60. In Landrigan's execution, ADOC administered ten grams of sodium thiopental, as opposed to the five grams called for in the protocol. (Special Operation Checklist, October 26, 2010 at 4, attached as Ex. I.)

61. In addition, ADOC used the back-up method for administering the lethal drugs as opposed to the standard method of placing IV catheters in the prisoner's peripheral veins. The back-up method involves an invasive surgical procedure requiring the insertion of a central line into the prisoner's groin. Landrigan's veins in his arms were strong and intact. There was no medical reason to use a central line.

62. In Robert Comer's May 22, 2007, execution, ADOC failed to follow the specified timing of the administration of the lethal drugs. ADOC administered the sodium thiopental and pancuronium bromide less than one minute apart in direct contradiction of the protocol.

62. Furthermore, ADOC asked Dr. Alan Doerhoff to conduct Comer's execution in spite of direct knowledge that Dr. Doerhoff had been banned from participating in Missouri executions because he was dyslexic, had problems with numbers, had knowingly improvised the doses of lethal injection drugs, had not adhered to a set protocol, and had not kept records of procedures.

63. Dr. Doerhoff had never seen or reviewed ADOC's written execution protocol before conducting Comer's execution. ADOC failed to follow its written protocol during Comer's execution.

///

///

**CLAIMS FOR RELIEF**

**CLAIM ONE: The State's Use of a Non-FDA-Regulated Substance Manufactured in a Foreign Country Creates a Substantial, Objectively Intolerable Risk of Harm that is Very Likely to Cause Needless Suffering in Violation of Plaintiff's Rights under the Eighth Amendment of the United States Constitution.**

64. Plaintiff incorporates by reference every statement and allegation set forth throughout this Complaint as if fully rewritten.

65. In carrying out Plaintiff's execution, Defendants will be acting under color of Arizona law.

66. Defendants violated federal law in recently acquiring a non-FDA-regulated substance purported to be sodium thiopental that they now intend to use in Plaintiff's execution.

67. Defendants intend to use a non-FDA-regulated substance meant for non-human animal use in Plaintiff's execution. Defendants intend to use a non-FDA-regulated substance from a batch with officially reported efficacy problems in Plaintiff's execution. An FDA-regulated barbiturate exists as a feasible, readily available alternative to ADOC's recently obtained non-FDA-regulated substance.

68. Defendants have, therefore, created a substantial, objectively intolerable risk of harm that will cause needless suffering during Plaintiff's execution, thereby depriving Plaintiff of his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishments.

**CLAIM TWO: The Administration of Non-FDA-Regulated Substance from a Foreign Source By a Medical Doctor or Other Trained Medical Professional Demonstrates Deliberate Indifference to Plaintiff's Right to Be Free from Cruel and Unusual Punishment**.

Plaintiff incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully rewritten.

69. In administering a three-drug lethal injection protocol, ADOC's purpose for using sodium thiopental is to anesthetize the condemned prisoner before the second and third drugs are injected. Because the purpose of the sodium thiopental in

ADOC's protocol is not to kill the prisoner, the administration of sodium thiopental is for a medical purpose.

70. A medical doctor and other medical professionals will participate in and oversee Plaintiff's execution. Trained medical professionals know or should know the substantial risks involved in administering a non-FDA-regulated drug to a human being.

71. Plaintiff does not consent to the use of a non-FDA-regulated drug during his execution.

72. ADOC's use of medical professionals who knowingly administer a substance from a non-FDA-regulated foreign source are acting with deliberate indifference and therefore violating Plaintiff's right to be free from cruel and unusual punishment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

(1) Temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiff with unlawfully obtained, non-FDA regulated sodium thiopental;

(2) A declaratory judgment that ADOC's current plan to execute Plaintiff by using an unlawfully obtained, non-FDA-regulated substance violates his rights under the Eighth Amendment of the United States Constitution; and that ADOC's administration of a non-FDA-regulated substance by a medical doctor or other trained medical professional demonstrates deliberate indifference in violation of Plaintiff's right to be free from cruel and unusual punishment;

(3) Monetary damages from Defendants Medical Team Member 1, 2, & 3.

(4) Appropriate and necessary discovery and an evidentiary hearing to permit Plaintiff to prove his constitutional claims;

(5) Reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States;

(6) Costs of the suit; and

(7) Any such other relief as the Court deems just and proper.

///

Respectfully submitted this 24th day of March, 2011.

          Jon M. Sands
          Federal Public Defender
          Dale A. Baich
          Robin C. Konrad

By:  s/Robin C. Konrad
     Counsel for Plaintiff